Carole **KOHLER,** Plaintiff,

v.

John H. **SHENASKY, II, M.D.,** et al., **Defendants.**

**Civil Action No. MJG–94–3240.**

United States District Court, D. Maryland.

Aug. 15, 1995.

C. Christopher Brown, Martin H. Schreiber, II, and Brown, Goldstein & Levy, Baltimore, Maryland, for plaintiff.

David R. Thompson, Cowdrey, Thompson & Karsten, P.A., Easton, Maryland, for defendants.

GARBIS, District Judge.

The Court has before it Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment. Having considered the legal memoranda submitted by the parties, the Court finds a hearing unnecessary to resolve the Motion.

## I. BACKGROUND [1]

Plaintiff Carole Kohler was diagnosed in 1984 as suffering from multiple sclerosis. She also suffers from massive obesity, hypothyroidism, hypertension and irritable bowel syndrome. As a result of the multiple sclerosis, Plaintiff's ability to walk is impaired, and she is required to be stationary for much of the day. This immobility, in turn, makes it difficult for Plaintiff to lose weight.

In 1993, Plaintiff began experiencing urinary incontinence. After several unsuccessful attempts to cure this condition, Plaintiff's internist, Dr. Richard E. Bird, referred her to John H. Shenasky, II, M.D. ("Dr. Shenasky"), a physician with Shenasky, Demarco &

---

1. For purposes of this Motion, the Court has considered all well pled allegations in Plaintiff's Complaint as true. *See Scheuer v. Rhodes,* 416 . U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

Genvert, P.A. ("the P.A."), a professional corporation employing urology specialists. The P.A. employs the only urology specialists in Salisbury, Maryland, the area in which Plaintiff resides.

On April 18, 1994, upon arrival at the P.A. office for her appointment with Dr. Shenasky, Plaintiff discovered that, because of her weight, she could not fit in the wheelchair provided by the P.A. and was thus unable to travel inside the building. Plaintiff informed an agent of the P.A. that she would return home, set another appointment date, and return with her own wheelchair.

Before Plaintiff could set a new appointment, however, Dr. Shenasky sent a letter to Dr. Bird informing him that he (Shenasky) was unwilling to see Plaintiff regarding her incontinence problem until Plaintiff lost weight. The text of the April 18, 1994, letter[2] read:

> Dear Rick:
>
> This patient had an appointment to see me in the office today but cancelled it because she could not fit in our wheelchair! There is really no need for me to see a patient who has a neurological condition and massive obesity for incontinence.
>
> The obvious thing to do is for the patient to be put on a weight reduction diet. If she is unwilling to lose appropriate weight, why be concerned about incontinence. While incontinence is I am sure a bothersome social problem to whose who suffer from it, it is not a condition from which anybody ever expired. I think the appropriate form of treatment here is for the patient to lose weight. When she gets down to her ideal weight for her height and if she is still incontinent, then we can exert some energy doing some evaluation to see if we can help the patient otherwise.

Given that the P.A. was the only urology practice in the area, as a consequence of Shenasky's refusal to treat Plaintiff, Plaintiff was forced to travel to Baltimore to see a urologist. Plaintiff also claims that the P.A. and Shenasky's refusal to provide access and treatment have caused her severe mental

anguish and left her with a feeling of worthlessness and rejection.

On November 22, 1994, Plaintiff filed this action alleging three claims: (1) that Shenasky, individually and acting as an agent of the P.A., discriminated against Plaintiff on the basis of her disability, in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* (the "ADA"); (2) that Shenasky and the P.A. denied Plaintiff benefits and services solely due to her disability in violation of Section 504 of the Federal Rehabilitation Act, 29 U.S.C. § 794; and (3) that Shenasky and the P.A. intentionally inflicted emotional distress upon Plaintiff.

Defendants have filed a Motion to Dismiss or, in the Alternative, for Summary Judgment, on the grounds that (1) Plaintiffs' causes of action under the ADA and the Rehabilitation Act are barred by the applicable statute of limitations; and (2) that Plaintiff has failed to state a claim for intentional infliction of emotional distress.

For the reasons that follow, the Court finds that Plaintiff's ADA and Rehabilitation Act claims are not barred by the applicable statute of limitations, but that Plaintiff has failed to state a valid claim for intentional infliction of emotional distress.

## II. *LEGAL STANDARD*

 A motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) ought not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). The Court, when deciding a motion to dismiss, must consider well pled allegations in a complaint as true, and must construe those allegations in favor of the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Jenkins v. McKeithen,* 395 U.S. 411, 421–22, 89 S.Ct. 1843, 1849, 23 L.Ed.2d 404 (1969). The Court must further disregard the contrary allegations of the opposing party. *A.S. Abell Co. v. Chell,* 412 F.2d 712, 715 (4th Cir.1969).

**2.** Plaintiff attached a copy of the April 18, 1994, letter to her Complaint.

## III. *DISCUSSION*

■ The Americans with Disability Act and the Rehabilitation Act, like many federal civil rights statutes, do not contain specific limitations periods. In such situations, Congress has directed courts to borrow the most appropriate state statute of limitations to apply to the federal cause of action. 42 U.S.C.A. § 1988. *See also McCullough v. Branch Banking & Trust Co.*, 35 F.3d 127, 129 (4th Cir.1994) (citing *Wilson v. Garcia*, 471 U.S. 261, 266–67, 105 S.Ct. 1938, 1942, 85 L.Ed.2d 254 (1985)). The Fourth Circuit has held that the selection of an appropriate state statute involves a two part analysis: "The court should first select the state statute 'most analogous' to the federal claim . . . then consider whether application of that limitations period is consistent with the federal statute and its underlying policies." *McCullough*, 35 F.3d at 129 (citations omitted).

Defendants argue that the "most analogous" state statute is Article 49B of the Maryland Annotated Code. Section 5 of this statute provides:

> It is unlawful for an owner or an operator of a place of public accommodation or an agent or employee of the owner or operator, *because of the . . . physical* or mental *handicap* [ ] of any person, *to refuse, withhold from, or deny to such person any of the accommodations, advantages, facilities and privileges of such place of accommodation.*

(Emphasis added). Section 9A further provides:

> Any person claiming to be aggrieved by an alleged discrimination prohibited by any section of this article may make, sign and file with the Human Relations Commission . . . a complaint in writing under oath. . . . *A complaint must be filed within six months from the date of the occurrence alleged to be a violation of this article.*

(Emphasis added). Defendants contend that the alleged discrimination against Plaintiff occurred on April 18, 1994, and that Plaintiff did not file her action until November 22, 1994, more than six months later. Defendants argue that Plaintiff's claims under the ADA and Rehabilitation Act are thus time-barred.

The Supreme Court addressed this issue in *Burnett v. Grattan*, 468 U.S. 42, 104 S.Ct. 2924, 82 L.Ed.2d 36 (1984), under slightly different facts. In *Burnett*, plaintiff had brought a racial and gender discrimination action under 42 U.S.C. §§ 1981, 1983, 1985, 1986 and the Fourteenth Amendment. Defendant argued that the six month statute of limitations from Art. 49B of the Maryland Code should apply because that state law prohibiting discrimination in the workplace was the "most analogous" state statute. The Supreme Court, affirming the Fourth Circuit's decision, disagreed.

The Supreme Court began its discussion by emphasizing that federal Civil Rights Acts

> established causes of action arising out of rights and duties under the Constitution and federal statutes. These causes of action exist independent of any other legal or administrative relief that may be available as a matter of federal or state law [and] are judicially enforceable in the first instance.

*Burnett*, 468 U.S. at 50, 104 S.Ct. at 2929. Given the nature of federal civil rights actions, the Court reasoned that "[a] state law is not 'appropriate' [for purposes of borrowing a limitations period] if it fails to take into account practicalities that are involved in litigating federal civil rights claims and policies that are analogous to the goals of the Civil Rights Acts." *Id.*, 468 U.S. at 50–52, 104 S.Ct. at 2930.

As support for this conclusion, the Court focused on the practical differences between judicial and administrative enforcement of a civil rights action. According to the Court, litigating a civil rights claim requires considerable preparation, including obtaining counsel, conducting an investigation sufficient to draft pleadings, establishing the amount of damages, preparing legal documents, and filing and serving a complaint. *Id.* The Court contrasted this preparation to the practical difficulties faced by an aggrieved party who invokes administrative remedies, such as Art. 49B. Under Art. 49B, an aggrieved party's sole responsibility is to "make, sign and file with the Human Relations Commission . . . a complaint in writing under oath." Md.Ann.

Code, Art. 49B, § 9(a) (1979). The complaint need not contain more than the name and address of the person or entity alleged to have committed the discriminatory act, "the particulars thereof," and "other information as may be required from time to time by the Commission." *Id.* The individual has no obligation to investigate his allegations, and the entire burden of developing the case rests on the Human Rights Commission.

In light of these differences, the Court surmised that

> When a legislature selects a statute of limitations to govern a particular cause of action, it takes in to account the burdens borne by parties to a suit of that sort. Article 49B, § 9(a), tells a person when he must act if he wishes to request the aid of the Human Rights Commission in resolving an employment discrimination dispute. *The time limit established by the Maryland Legislature reflects in part the minimal burden state law places on the administrative complainant, which does not correspond in any significant way to the substantial burden federal law places on a civil rights litigant.*

*Id.,* 468 U.S. at 51–52, 104 S.Ct. at 2930–31 (emphasis added). The Court thus concluded:

> The divergence between the goals of the federal civil rights statutes and of the state employment discrimination administrative statute is clear. . . . The goals of the federal statutes are compensation of persons whose civil rights have been violated. . . . That these are not the goals of the statute empowering Maryland's administrative agency to resolve employment discrimination complaints is apparent both because the remedial authority of the agency is limited, and because the state scheme does not create a private right of action. The stated goal of the state administrative procedure is the prompt identification and

**3.** *McNutt,* like *Burnett,* involved a plaintiff asserting a racial discrimination claim under 42 U.S.C. § 1981.

**4.** The court stated:

> [T]he enforcement schemes contemplated by Maryland's Article 49B and 42 U.S.C.A. § 1981 are completely different. Maryland's administrative proceeding is designed primarily to

resolution of [ ] disputes. The administrative scheme, including a short statute of limitations, encourages conciliation and private settlement through the agency's intervention in live disputes.

468 U.S. at 54, 104 S.Ct. at 2932.

The Court also cited with approval *McNutt v. Duke Precision Dental & Orthodontic Lab.,* 698 F.2d 676 (4th Cir.1983), in which the Fourth Circuit held that the Maryland general three-year statute of limitations, rather than the six month Art. 49B period, was the appropriate statute to look to for federal civil rights actions.[3] In *McNutt,* the Fourth Circuit had stressed the practical differences between administrative and judicial proceedings in litigating a civil rights case, and in the enforcement scheme.[4]

Defendants argue, however, that the proper authority for this issue is *McCullough v. Branch Banking & Trust Co.,* 35 F.3d 127 (4th Cir.1994), a recent Fourth Circuit opinion in which the court held that the 180–day limitations period provided by a North Carolina statute was more appropriate for purposes of plaintiff's Rehabilitation Act claim than the more general three-year period for personal injury claims. In deciding *McCullough,* the court relied heavily on its prior ruling in *Wolsky v. Medical College of Hampton Rds.,* 1 F.3d 222 (4th Cir.1993). In *Wolsky,* the court was required to borrow an appropriate statute from Virginia law. The Virginia legislature had enacted The Virginia Rights of Persons with Disabilities Act (the "Virginia Act"), which, to a great extent, mirrored the federal Rehabilitation Act. The Virginia Act, however, contained an express one-year statute of limitations. The district court, in an attempt to follow the precedent of other circuits, applied the three-year personal injury statute of limitations. The Fourth Circuit reversed, stating:

> "eliminate the discrimination by conference, conciliation, and persuasion." . . . In 42 U.S.C.A. § 1981, of course, there is no such conciliatory scheme or purpose. It is simply a machine for adversarial enforcement of rights secured by federal law.
> *McNutt,* 698 F.2d at 679.

*Given that the Virginia Act is patterned after the Rehabilitation Act,* the district court should have applied the statute of limitations found in the Virginia Act rather than the personal injury statute of limitations. *Wilson* requires district courts to look to the most appropriate state statute of limitations.

*Id.* at 224 (emphasis added).

In reaching this conclusion, the court distinguished its holding from those cases in which the respective states *had not* enacted statutes expressly addressing discrimination against disabled persons. *Id.* In the case before the court, given that the Virginia legislature had specifically enacted an "exact state counterpart" to the federal Rehabilitation Act, that counterpart would, logically speaking, be the "most analogous" and "appropriate" state statute. The selection of the "most analogous" or "appropriate" state statute would not be as clear cut, according to the court, when a state had not enacted legislation directly addressing the concerns of the Rehabilitation Act, or where the legislature had enacted a statute but omitted an applicable statute of limitations. *Id.* at 225.

In *McCullough,* as in *Wolsky,* the Fourth Circuit was faced with a case in which the relevant state legislature had enacted a specific statute aimed at protecting disabled individuals from discrimination. In *McCullough,* as in *Wolsky,* the court underscored the fact that the North Carolina statute had been modelled after the Rehabilitation Act and intended to create a state counterpart to the federal statute. The North Carolina Act expressly provided that it had been enacted to "encourage and enable all handicapped people to participate fully to the maximum extent of their abilities in the social and economic life of the state." *McCullough,* 35 F.3d at 130, *quoting* N.C.Gen.Stat. § 168A–2. The North Carolina Act also specifically prohibited concurrent jurisdiction under it and the Rehabilitation Act, thereby making it impossible for a claimant to recover for the same discrimination in both state and federal court. *Id.* Based on this statutory language, the Fourth Circuit found a clear legislative intent to create a state counterpart to the Rehabilitation Act. Consequently, the

court concluded the North Carolina Act was the "most analogous" and "appropriate" statute from which to borrow a limitations period.

In this case, by contrast, there is no evidence that Maryland intended to enact Art. 49B as a state "counterpart" to the federal Rehabilitation Act or the Americans with Disability Act. While Article 49B § 5 does prohibit discrimination by an owner or operator of a place of public accommodation against an individual on the basis of a "physical or mental handicap," there is no indication that Maryland intended to create a statute providing the same extensive rights and protections as the federal acts, *cf. Wolsky,* 1 F.3d at 224, or an exclusive state remedy for such discrimination, *cf. McCullough,* 35 F.3d at 131. Given this distinction from *Wolsky* and *McCullough,* the Court finds the instant case more analogous to *McNutt* and *Burnett,* in which the courts held that three-year limitations period provided by the Maryland statute governing general civil actions was more appropriate for federal civil rights actions than the 180–day Art. 49B period. *See also Jones v. Frederick County Bd. of Educ.,* 689 F.Supp. 535, 538 (D.Md.1988) (holding the Maryland general three-year limitation period applicable to claims under Rehabilitation Act); *Huber v. Howard County, Md.,* 849 F.Supp. 407, 415 (D.Md.1994) (same). *But see also Carrozza v. Howard County, Md.,* 847 F.Supp. 365 (D.Md.1994) (holding that the proper limitation period for plaintiff's Rehabilitation Act claim was the six-month period provided in Art. 49B). Thus, Plaintiff had three years in which to file her claims under the ADA and the Rehabilitation Act, and her claims filed November 22, 1994 were timely.

**A. Plaintiff's Claim for Intentional Infliction of Emotional Distress**

■ To establish a cause of action for intentional infliction of emotional distress under Maryland law, Plaintiff must establish four essential elements:

(1) The conduct must be intentional or reckless;

(2) The conduct must be extreme and outrageous;

(3) There must be a causal connection between the wrongful conduct and the emotional distress; and

(4) The emotional distress must be severe.

*Batson v. Shiflett,* 325 Md. 684, 602 A.2d 1191, 1216 (1992), *quoting Harris v. Jones,* 281 Md. 560, 380 A.2d 611, 614 (1977).

The Maryland Court of Appeals has further stated that " '[i]n developing the tort of intentional infliction of emotional distress, whatever the relationship between the parties, recovery will be meted out sparingly, its balm reserved for those wounds that are truly severe and incapable of healing themselves.' " *Batson,* 602 A.2d at 1216, *quoting Figueiredo–Torres v. Nickel,* 321 Md. 642, 584 A.2d 69, 75 (1991). Consequently, Maryland's highest court has upheld claims for intentional infliction of emotional distress only in cases involving truly egregious acts. *See B.N. v. K.K.,* 312 Md. 135, 538 A.2d 1175 (1988) (physician did not tell nurse with whom he had sexual intercourse that he had herpes); *Young v. Hartford Accident & Indemnity,* 303 Md. 182, 492 A.2d 1270 (1985) (worker's compensation insurer's "sole purpose" in insisting that claimant submit to psychiatric examination was to harass her and force her to abandon her claim or commit suicide).

Plaintiff's compliant fails to state two of the essential elements of an intentional infliction of emotional distress claim. First, with regard to Dr. Shenasky's comments in the April 18, 1994, letter, Plaintiff has failed to allege facts adequate to establish that Defendants' conduct was intentional or reckless. A defendant's conduct is intentional or reckless when " 'he desires to inflict severe emotional distress, and also where he knows that such distress is certain, or substantially certain, to result from his conduct; or where the defendant acts recklessly in deliberate disregard of a high degree of probability that the emotional distress will follow.' " *Beye v. Bureau of National Affairs,* 59 Md.App. 642, 477 A.2d 1197, 1205 (1984) (*quoting Harris,* 380 A.2d at 611). In this case, Plaintiff alleges

that Dr. Shenasky drafted and sent a letter *to her internist* in which he belittled Plaintiff's condition and refused to treat her until she lost a sufficient amount of weight. Plaintiff has not alleged (and could not credibly allege) that Shenasky intended, or was substantially certain, that Plaintiff (or anyone other than the intended recipient) would see or read the contents of his private communication to Dr. Bird. This he could not have intended or have been substantially certain that the letter would cause the Plaintiff to experience severe distress. Nor is there an allegation to support a conclusion that Shenasky acted recklessly in deliberate disregard of a high degree of probability that Plaintiff would learn of his comments. The letter was not addressed to Plaintiff, nor was a carbon copy sent to her. Moreover, it would not be reasonable to infer that after receiving the letter, Dr. Bird would forward it to Plaintiff. Although Plaintiff alleges conclusively that Dr. Shenasky "tormented" her with his comments, *see* Pl.'s Mem. in Op. at 8, her specific pleadings establish that Dr. Shenasky did not act with the requisite intent or recklessness that his comments would cause Plaintiff emotional distress.[5]

In any event, Dr. Shenasky's comments fail to constitute "extreme and outrageous" conduct under Maryland law. For conduct to be "extreme and outrageous," it must be "go beyond all possible bounds of decency, and . . . be regarded as atrocious, and utterly intolerable in a civilized community." *Harris,* 380 A.2d at 611. Where the conduct arises from an "abuse of a position," defendant's conduct "will be carefully scrutinized by the Courts." *Id.* Plaintiff alleges that Dr. Shenasky's comments and refusal to treat Plaintiff were extreme and outrageous and constituted an abuse of his position as Plaintiff's physician.

Although as Plaintiff's personal physician, Dr. Shenasky was undoubtedly in a position potentially to cause Plaintiff emotional distress, there is no evidence that Dr. Shenasky abused this position in an intentional or reck-

---

5. The Court agrees with Defendant's assertion that at most, Plaintiff has alleged a claim for negligent infliction of emotional distress, a cause of action expressly rejected by the Maryland

Court of Appeals. *See Hamilton v. Ford Motor Credit Co.,* 66 Md.App. 46, 502 A.2d 1057, 1065–67, *cert. denied,* 306 Md. 118, 507 A.2d 631 (1986).

less manner, or that his conduct was extreme and outrageous in light of his position. The Court will assume (but is not deciding) that Dr. Shenasky's statements regarding the Plaintiff could be viewed as an inappropriate expression *to a medical colleague* of the reasons why the patient should be treated for incontinence only after she had resolved her obesity problem. However, the subject statements, even if made directly to the Plaintiff would, at most, constitute insensitivity but not the "extreme and outrageous" conduct required under Maryland law to support Plaintiff's claim.

The Defendants' decision to decline to treat Plaintiff for incontinence until she had reduced her obesity does not meet the standard of "extreme and outrageous" conduct. The fact that the Defendants' had the only urological practice in Plaintiff's immediate area does not add enough to warrant a conclusion that their conduct was "extreme and outrageous." As the Maryland Court of Appeals has stressed, the tort of intentional infliction of emotional distress is "to be used sparingly and only for opprobrious behavior that includes truly outrageous conduct" *Kentucky Fried Chicken v. Weathersby*, 326 Md. 663, 607 A.2d 8, 11 (1992). The conduct "must strike the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung," *Hamilton v. Ford Motor Credit Co.*, 502 A.2d at 1063, 1064 (Md.Ap.), *cert. denied*, 306 Md. 118, 507 A.2d 631 (1986), and be considered by an average member of the community as "a complete denial of the plaintiff's dignity as a person." *Leese v. Baltimore County*, 64 Md. App. 442, 497 A.2d 159, 173, *cert. denied*, 305 Md. 106, 501 A.2d 845 (1985). Even assuming that the Defendants' decision regarding Plaintiff's treatment were a "wrong" medical judgment and caused her the inconvenience of travelling to see a doctor who felt differently, the Defendants' action was not "extreme and outrageous" to constitute the tort of intentional infliction of emotional distress.

## IV. CONCLUSION

For the foregoing reasons:

1. Defendants' Motion to Dismiss Count I (the ADA claim) and Count II (the Rehabilitation Act claim) is **DENIED.**

2. Defendants' Motion to Dismiss Count III (the Intentional Infliction of Emotional Distress claim) is **GRANTED.**