Betty **ROSS**,

v.

**BOARD OF EDUCATION OF PRINCE GEORGE'S COUNTY**

No. CIV. JFM–99–1539.

United States District Court, D. Maryland.

April 5, 2002.

any ground.

Brian C. Williams, Law Office, Lanham, MD, Trevor M. Fuller, The Fuller Law Firm, Washington, DC, for Plaintiff.

Sheldon L. Gnatt, Knight Manzi Nussbaum and LaPlaca PA, Upper Marlboro, MD, for Defendant.

## MEMORANDUM

MOTZ, District Judge.

Plaintiff Betty Ross alleges that Defendant Prince George's County Board of Education (the "school board") discriminated against her based on her disability. She brings this suit pursuant to the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.;* the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.;* and the Maryland Fair Employment Practices Act ("FEPA"), Md.Code Ann. Art. 49B. Defendant has moved for summary judgment. In light of *Bd. of Trustees of the Univ. of Ala. v. Garrett,* 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001), Plaintiff has conceded that Defendant is immune from suit under the ADA and summary judgment will be granted on Plaintiff's ADA claim. Defendant's motion for summary judgment on Plaintiff's Rehabilitation Act and FEPA claims will be granted in part and denied in part.

### I.

Ross has suffered from rheumatoid arthritis for most of her life. She had a right hip replacement in 1978 and a left hip replacement in 1979. Pl.'s Ex. 8. Due to this disability, she has great difficulty walking and climbing stairs. Ross began her employment as a teacher in the Prince George's County public schools in 1985.

During the 1994–95 academic year, Ross worked at Thurgood Marshall Middle School ("TMMS"). Her classroom was located on the main floor of the school, which minimized the potential problems posed by her disability. She parked in a handicapped parking space near the front door, only a short distance from her classroom. Ross Dep. at 49–50. The cafeteria, teachers' lounge, teachers' mailboxes, copy machine and library were all on the main level which allowed Plaintiff to avoid walking long distances and climbing stairs to and from the basement level of the school. *Id.* at 83.

For the 1995–96 school year, Ross was assigned to the eighth grade teaching team which was located on the basement level of the school. *Id.* at 75. Due to this classroom location, Ross had to climb approximately 24 stairs to the main level at least several times a day. *Id.* at 81–82. Within a few days of beginning the school year, Ross was experiencing pain due to the stair climbing. *Id.* at 238, 246. She approached TMMS's Principal, Barbara Parker Simmons (Barbara Parker at the time), at the end of August and asked her whether she could be "exempt from going up and down the stairs." *Id.* at 238. She also presented Parker Simmons with a note from her physician, Dr. Hampton Jackson. *Id.* at 90. Parker Simmons told Plaintiff that she could not be exempted from stair climbing but could attempt to work out an informal arrangement with her fellow teachers. *Id.* at 238. Members of her team agreed to escort her students up and down the stairs at the beginning and end of the day, but Ross still had to use the stairs to escort them to one class, the cafeteria and any assemblies. *Id.* at 239–40.

At about the same time that Ross requested the exemption from climbing stairs, she also asked Parker Simmons if she could be transferred to a vacant guidance counselor position. The school's vice-principal had suggested the position to her as a way of avoiding daily stair climbing. *Id.* at 248–249. Parker Simmons told Plaintiff that she already had someone in mind for the position. *Id.* at 251. In addition, Ross and the head custodian discussed Ross entering the building at the basement level through the boiler room.

*Id.* at 248, 262–70. Parker Simmons also considered such an arrangement and discussed it with the custodian. She ultimately rejected the idea because the head custodian believed it would be unsafe. *Id.* 94, 270.

On October 24, 1995, Ross was examined by Marc Goldman of the Anderson Orthopaedic Clinic for her right hip pain. Pl.'s Ex. 8. Goldman issued Ross a Certificate of Disability which stated that she could return to "light duty" on October 25, 1995 with the following restrictions: "no stair climbing, no ambulating greater than 100 ft." Pl.'s Ex. 9. Ross gave the certificate to Parker Simmons' secretary and shortly thereafter discussed its contents with Parker Simmons. Ross Dep. at 224. Ross recalls Parker Simmons telling her that there was no light duty in the Prince George's County School System. *Id.* at 101–103, 233–35, 258.

William Simmons, the instructional supervisor who supervised TMMS, was notified in a letter from Ross' doctor of the restrictions placed on Ross. Simmons Dep. 20–21. Given the restrictions, Simmons determined that Ross could not return to work at TMMS. *Id.* at 21–22. Simmons believed that Ross should not return because she would not be able to escort her students throughout the building. *Id.* at 32. He did not consider having another teacher escort Ross' students. *Id.* at 32–33, 35.

Despite Simmons' opinion, Ross continued working at TMMS. On December 12, 1995, Ross' right hip prosthesis partially collapsed. Ross Dep. at 272. She returned to work on December 18, 1995 with a statement from her doctor that she should not be climbing stairs and should remain as sedentary as possible. Pl.'s Ex. 13. Upon her return, Ross asked Parker Simmons if she could be moved to a classroom on the main floor as an accommodation of her disability. Ross Dep. at 277.

Parker Simmons suggested that Ross' adult son help her get down the stairs to her classroom. For approximately two months after this, Ross entered the building through a doorway near the gym which had a steep ramp that provided access to the gym parking lot. *Id.* at 108–111. The gym entrance required Ross to descend a half a flight of stairs which she did on crutches. At this time, her doctor had advised her to use a wheelchair. *Id.* at 115–126. Members of Ross' team escorted her classes, performed her bus duty and brought her mail to her. *Id.* at 111–12.

Over her winter break, Ross complained about her situation to school board member Marcy Canavan. On January 17, 1996, Parker Simmons approached Ross and told her she had received a call from the deputy superintendent of Schools at Canavan's request. *Id.* at 122, 285–86. On January 23, 1996, Parker Simmons notified math teacher Chris Jones who had a classroom on the main floor of the school that he would have to switch classrooms with Ross to accommodate Ross pursuant to the ADA. Pl.'s Ex. 10. The switch in classrooms actually occurred in mid-February. Ross Dep. at 295. For the rest of that school year, Ross used a wheelchair while teaching, *id.* at 129, and the special education teachers across the hall from Ross' new room assisted her class during fire drills, *id.* at 149. Approximately two weeks after Ross moved classrooms, deputy superintendent Robert Slade visited Ross' classroom and found the accommodations to be "appropriate and adequate." Slade Dep. at 31.

Ross did not work during the 1996–97 school year as she underwent a right hip revision and a right knee replacement. Ross Dep. at 178–80. In August 1997, Ross attempted to return to TMMS to begin the 1997–98 school year. In a letter dated August 18, 1997, her physician out-

lined Ross' disability and stated that she is limited to lifting no more than five pounds, cannot walk more than 20 yards with any regularity and cannot repetitively walk up a short flight of stairs. He concluded that Ross was restricted in "pushing, pulling and climbing due to these diagnosis [sic]," but was cleared to return to work. Pl.'s Ex. 14. When Ross attempted to return, she was informed by the vice-principal that Simmons had barred her return until her doctor would release her with no restrictions. Ross Dep. at 400–06. Ross spoke with Simmons by phone and was told that "no teacher ... of this county could teach with restrictions." *Id.* at 412. According to Ross, when she asked Simmons about accommodating her pursuant to the ADA, Simmons told her to leave the school or he would call the police. *Id.* In his deposition, Simmons testified that his decision in 1997 was not based on Ross' restriction on climbing stairs, but on Ross' restrictions on pushing and pulling which he believed would prevent her from "dealing with youngsters in a classroom situation." Simmons Dep. at 57, 72. However, Simmons testified that teachers are not trained in self-defense or how to break up a physical altercation between students. *Id.* at 58. Finally, Simmons concluded that teachers are not required to intervene physically with a student or students. *Id.* at 67.

On August 28, 1997, Ross wrote to Simmons to memorialize their conversation and also to request the policy that required teachers to have no restrictions in order to return to work. Pl.'s Ex. 18. The next day, Simmons sent Ross a three page teacher position description and told Ross she could return when her doctor verified that she could perform all of the responsibilities listed without any restrictions. Pl.'s Ex. 19, 20. On October 4, 1997, Ross' doctor responded by reiterating the limitations in his August 18, 1997 letter and stating that he was not qualified to determine whether Ross is able to perform teaching related responsibilities. Pl.'s Ex. 21.

After leaving TMMS, Ross contacted her union, the Prince George's County Education Association ("PGCEA"), for assistance. Ross Dep. at 406, 413–414. Between late August and early November 1997, the PGCEA worked with county school officials to have Ross reinstated. See Exs. 15, 16. Dr. Sterling Marshall, Chief Division Administrator for personnel, decided to allow Ross to return to her position at TMMS "[t]o resolve a matter that had been going on for some time without any resolution and to see to what extent this individual could perform her duties." Marshall Dep. at 60. He told Simmons to speak with TMMS's new principal, Barbara Atwater, about having Ross placed in a classroom on the main floor and exempting her from hall duty. Simmons never told Marshall there was a problem with these accommodations so Marshall assumed that they had been implemented. *Id.* at 60–66. Simmons informed Atwater that Ross needed "an entranceway, classroom on the first level, bathroom on the first level near her room." Atwater Dep. at 24–25. Atwater also arranged for someone on Ross' team to escort her class to the cafeteria and to have her mail sent to her. *Id.*

Ross returned to her position at TMMS on November 3, 1997. She asked Atwater if she could be assigned to a classroom on the first floor as an accommodation. Ross Dep. at 459–60. In accordance with her understanding of Simmons' instructions, Atwater placed Ross in a classroom on the basement level of the building. Atwater Dep. at 26–27. On November 5, 1997, Ross was injured on the stairs of TMMS and has been unable to return to work. Ross Dep. at 414–15.

## II.

The school board claims that Ross' discrimination claims relating to the 1995–96 school year are time-barred under both the Rehabilitation Act and the Maryland Fair Employment Practices Act.[1] Ross filed her charge of discrimination on December 18, 1997 and brought this action on June 1, 1999, which bars Rehabilitation Act and FEPA claims relating to the 1995–96 school year unless they can be considered under the continuing violation doctrine.[2] "[T]he various formulations of the continuing violation doctrine generally consider two main criteria: whether the separate incidents are sufficiently related, and whether the acts individually should have triggered the plaintiff's awareness of and duty to challenge the employer's discriminatory conduct." *Muhammad v. Giant Food, Inc.*, 2000 WL 1828248, at *3 (D.Md. 2000) (*citing* 2 Barbara Lindemann & Paul Grossman, *Employment Discrimination Law* 1357–63 (3d ed.1996)). The continuing violation doctrine cannot be applied in this case because the school board's actions during the 1995–96 school year should have caused Ross to formally challenge the school board's conduct. Ross was aware of the ADA from the beginning of the 1995–96 school year, Ross Dep. at 41, and specifically requested that the school board accommodate her pursuant to

the ADA on at least one occasion, *id.* at 115–16. Summary judgment will be granted to the school board as to Ross' claim of discrimination during the 1995–96 school year.[3]

## III.

Ross alleges that the school board discriminated against her based on her disability by refusing to allow her to return to work at TMMS between August 26 and November 2, 1997 and failing to accommodate her when she returned to work on November 3, 1997. The school board argues that its refusal to allow Ross to return to the classroom was not discrimination because Ross was unable to perform the essential functions of a classroom teacher even with accommodations. In addition, it contends that when it did allow Ross to return, she was accommodated.

### A.

Section 504 of the Rehabilitation Act protects an "otherwise qualified individual with a disability." 29 U.S.C. § 794(a). "In the employment context, an otherwise qualified person is one who can perform 'the essential functions' of the job in question." *School Bd. of Nassau County, Fla. v. Arline*, 480 U.S. 273, 288 n. 17, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987) (*citing* 45 C.F.R. § 84.3(k) (1985)). Simmons

---

1. Both parties have assumed that the Rehabilitation Act and the FEPA provide the same protection and require the same elements of proof. For purposes of this motion, I will accept that assumption. *But see Kohler v. Shenasky*, 914 F.Supp. 1206, 1211 (D.Md. 1995) (explaining that "there is no indication that Maryland intended [the FEPA to] provid[e] the same extensive rights and protections as the [Rehabilitation Act]").

2. A three year statute of limitations applies to Rehabilitation Act claims in Maryland. *See id.* at 1209–11. Defendants state that the FEPA has a two year statute of limitations, citing § 42 of article 49B. However, that sec-

tion only applies to discrimination actions brought pursuant to county code. The relevant limitations period is found in § 9A, which limits claims to alleged violations that occurred within six months of the date a plaintiff files her charge of discrimination.

3. Even though the alleged acts of discrimination do not constitute an actionable claim due to the statute of limitations, they "may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue . . . ." *United Air Lines v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977).

and other school board officials believed that Ross' physical restrictions would prevent her from maintaining order in the classroom and effectively handling student discipline. They considered these to be essential functions of a classroom teacher position.[4]

Even if I assume that maintaining order in the classroom and disciplining students are essential functions of the classroom teacher job, based on the current record, a reasonable jury could find that Ross was able to perform these essential functions. Initially, Simmons seemed to suggest that maintaining order and handling student discipline required Ross to be able to physically intervene in conflicts between students. However, he later acknowledged that teachers are not trained in self-defense and are not expected to physically intervene in student conflicts. In addition, the school board did not raise this issue when Ross had previously taught while using a wheelchair in 1995. In fact, at that time, the deputy superintendent visited TMMS and approved of Ross' situation. Therefore, the school board's motion for summary judgment will be denied as to Ross' claim of discrimination between August 26, 1997 and November 2, 1997.

### B.

■ The school board argues that it accommodated Ross upon her return to TMMS on November 3, 1997. It points out that Marshall decided that the school board would accommodate Ross as much

as possible and that Simmons spoke to TMMS's new principal to inform her of the need for accommodation. Principal Atwater testified that Ross was reasonably accommodated by being placed in a basement classroom that was close to a bathroom and having someone on Ross' team escort her class to the cafeteria and bring Ross her mail. Atwater Dep. at 24–25.

■ The school board does not have to provide every accommodation on Ross' "wish list." Nor does it have to provide an accommodation that imposes an undue hardship upon it, but it must "make whatever accommodations are reasonably possible in the circumstances so as to allow the employee to perform the functions essential to [her] position." *Miranda v. Wis. Power & Light Co.*, 91 F.3d 1011, 1017 (7th Cir.1996); *see also Howell v. Michelin Tire Corp.*, 860 F.Supp. 1488, 1492 (M.D.Ala.1994) ("A reasonable accommodation, therefore, is one that would enable an employee with a disability to enjoy an equal opportunity for benefits and privileges of employment as are enjoyed by employees without disabilities.").[5] Despite its attempted accommodation,[6] a reasonable jury, in light of Ross' experience at TMMS during the 1995–96 school year, could find that the school board failed to reasonably accommodate Ross so that she could perform the essential functions of her job. *See Champ v. Baltimore County*, 884 F.Supp. 991, 999 (D.Md.1995) ("[T]he decision of whether reasonable accommo-

---

4. While Simmons contended that Ross should not be allowed to return to the classroom in 1995 because she was unable to escort her students through the hallway due to her limited mobility, the school board no longer contends that this was an essential function of Ross' job.

5. Although these cases were addressing a claim under the ADA, they are relevant in a Rehabilitation Act claim because under both acts, "the substantive standards for determin-

ing liability are the same." *Myers v. Hose*, 50 F.3d 278, 281 (4th Cir.1995).

6. It seems possible that Simmons instructed Atwater to assign Ross to a classroom on the main floor as an accommodation, but due to the ambiguous language that he used ("first" rather than "main"), Atwater misunderstood and assigned Ross to a classroom on the basement level. If this is the case, it seems that Atwater's actions were hardly an accommodation at all.

dation would enable a disabled person to perform the essential functions of [her] job is ... a fact-specific inquiry."). During the 1995–96 school year, Ross was having significant difficulties performing the essential functions of her job while assigned to a classroom on the basement level. The school board does not indicate how its accommodation, which included a classroom assignment on the basement level of the school, addressed most of these difficulties and Ross' need to avoid stairs completely, or at least almost completely. For example, the school board has not addressed how Ross would get to her classroom at the beginning and end of the day, who would escort her class to the main level at times other than lunch and how Ross would gain access to the teachers' lounge and copier, which are both located on the main floor. Therefore, the school board's motion for summary judgment on Ross' claim of failure to reasonably accommodate her when she returned to TMMS on November 3, 1997 will be denied.

A separate order effecting the rulings made in this memorandum is being attached herewith.

### ORDER

For the reasons stated in the accompanying memorandum, it is, this 5th day of April 2002

ORDERED

1. Defendant's motion for summary judgment is granted in part and denied in part; and

2. Judgment is entered in favor of Defendant as to Count I.