**THE CIVIC ASSOCIATION OF THE DEAF OF NEW YORK CITY, INC. (also known as the New York City Civic Association of the Deaf) and Steven G. Younger, II, on behalf of themselves and al others similarly situated, Plaintiffs,**

v.

**Rudolph GIULIANI, as Mayor of the City of New York, Howard Safir, as Commissioner of the Fire Department of the City of New York, Carlos Cuevas, as City Clerk and Clerk of the New York City Council, Peter Vallone, as Speaker and Majority Leader of the New York City Council, Thomas Ognibene, as Minority Leader of the New York City Council, and the City of New York, Defendants.**

No. 95 Civ. 8591(RWS).

United States District Court, S.D. New York.

July 28, 1997.

Broach & Stulberg, New York City, for Plaintiffs; Robert B. Stulberg, of counsel.

Center for Constitutional Rights, New York City, for Plaintiffs; Franklin Siegel, Patrick Sullivan, Michael Schwartz, of counsel.

Honorable Paul A. Crotty, Corporation Counsel of the City of New York, New York City, for Defendants; Jonathan Pines, of counsel.

## OPINION

SWEET, District Judge.

In this class action brought pursuant to the Americans With Disabilities Act of 1990 (the "ADA"), 42 U.S.C. §§ 12101 *et seq.* and the Rehabilitation Act of 1973, 29 U.S.C. § 794, the Plaintiffs, a class of deaf and hearing-impaired individuals residing in New York City (the "City"), have moved to extend the injunction issued on February 9, 1996 to require the Defendants to restore two-button emergency alarm boxes and all deactivated boxes to a pilot area previously exempt from the scope of the injunction.

For the reasons set forth below, the injunction will be modified to require the City to replace one-button alarm boxes installed in the pilot areas with two-button boxes. However, the City will not be ordered to reinstall all deactivated boxes in the pilot areas.

### Prior Proceedings

Plaintiffs the Civic Association of the Deaf of New York City, Inc. ("NYCCAD") and Steven G. Younger II ("Younger") (collectively, "Plaintiffs") filed their complaint on October 10, 1995, alleging that the Defendants' plan to deactivate all City alarm boxes and replace them with a telephone emergency reporting system violated the ADA, the Rehabilitation Act and the Equal Protection Clause. On October 25, 1995, they brought an order to show cause seeking a temporary restraining order and a preliminary injunction. On October 25, 1995, the motion for a TRO was denied and the hearing on the preliminary injunction was consolidated with trial on the merits, pursuant to Federal Rule of Civil Procedure 65(a)(2).

After a hearing on the merits, the Court, by order dated February 9, 1996, certified a plaintiff class of deaf and hearing-impaired individuals in New York City, granted judgment declaring that Defendants' proposed removal of alarm boxes violated the ADA and the Rehabilitation Act, and enjoined Defendants from "carrying out any shutdown, deactivation, removal, elimination, obstruction, or interference with the existing street alarm box system, and from acting to replace the existing accessible street alarm box system with notification alternatives which are not accessible to the deaf." *Civic Ass'n of Deaf v. Giuliani*, 915 F.Supp. 622, 639 (S.D.N.Y.1996).

The Opinion, however, refused to require the Defendants to restore boxes that had been removed as part of a pilot program to test the proposed "replacement" of street alarm boxes with public telephone reporting through an "Enhanced 911" ("E–911") system that would identify automatically a caller's location and telephone number. *Id.* The Opinion also granted leave to Defendants to apply for dissolution or modification of the order upon a demonstration that "an accessible notification alternative exists." *Id.* The

Opinion indicated that an E–911 telephone system that actually identified the location of the caller, along with the implementation of a protocol to permit the hearing-impaired to indicate the type of emergency being reported, would be sufficiently accessible under the ADA. *Id.* at 638. The Opinion also stated: "If, within one year of judgment, Defendants have not successfully dissolved or modified the existing injunction ... a further application may be made" to enjoin the Defendants to restore the alarm boxes to pilot areas. *Id.* at 639.

On June 11, 1996, Defendants moved to vacate the injunction and dismiss the complaint as moot, on the grounds that the City had devised a non-discriminatory alternative emergency reporting system. By letter dated February 21, 1997, the City requested permission to withdraw the motion. By order dated April 1, 1997, the motion was withdrawn and removed from the Court's calendar.

By letter dated February 24, 1997, the Plaintiffs requested that the Defendants be enjoined to restore two-button alarm boxes and all deactivated boxes in the pilot areas. The letter was treated as a motion and oral argument was heard on May 21, 1997. The Court received additional materials through June 6, 1997, at which time the motion was deemed fully submitted.

### The Parties

Plaintiffs are a class of approximately 65,000 deaf and hearing-impaired individuals in New York City. Named-plaintiff Younger, a thirty-year-old man who resides in Manhattan, has been totally deaf since birth. He is the vice-president of NYCCAD, a New York not-for-profit corporation with offices in Manhattan and Queens. NYCCAD, which has approximately 569 members, is the largest deaf-run advocacy organization for deaf people in New York City.

Defendant Rudolph Giuliani is the Mayor of the City of New York (the "Mayor"); Howard Safir, currently the Chief of Police, was the Commissioner of the Fire Department (the "Commissioner") of the City of New York at the time this action was filed; Carlos Cuevas is City Clerk and Clerk of the New York City Council (the "Clerk") and

legislation enacted by the City Council is put into effect through his certification and publication; Peter Vallone is Speaker and Majority Leader of the New York City Council (the "Speaker"); Thomas Ognibene is Minority Leader of the New York City Council (the "Minority Leader"); and the City is a municipal corporation duly organized under the laws of the State of New York.

The Mayor, the Commissioner, the Clerk, the Speaker, and the Minority Leader are sued here in their official capacities. The City, the Fire Department, and the City Council are "public entities" pursuant to 42 U.S.C. § 12131(1)(A). The Fire Department receives federal funds and is, therefore, subject to the provisions of the Rehabilitation Act.

### Facts

A complete recitation of the factual background of this case appears in the Court's prior opinion, familiarity with which is assumed. *Civic Association,* 915 F.Supp. at 626–30. The facts relevant to decision of the instant motion are set forth below.

It is estimated that over 65,000 deaf or hearing-impaired people reside in New York City. Under current procedures, the deaf and hearing-impaired can report fires and other emergencies in most parts of New York City through private telephones or through public telephones or emergency alarm boxes located on the City's streets.

New York City's current street alarm box system consists of approximately 16,000 alarm boxes, made up of three types. One type, the Box Alarm Read-out System (the "BARS box") is an electro-mechanical device operated by pulling a lever. A signal is then relayed via telegraph in Morse Code directly to the Fire Department. BARS boxes do not permit voice contact. There are approximately 5,800 BARS boxes in New York City.

The second, newer type of street alarm boxes, known as Emergency Response System ("ERS") boxes, do provide voice communication with emergency services dispatchers. Most ERS boxes contain two buttons— a red button to be used in case of fire, a blue one to hail the police—and a speaker,

through which voice communication takes place. These boxes are known as "two-button boxes" in the argot of this litigation.

The third type of alarm box is a modified ERS box consisting of a single button and speaker. These boxes are referred to as "one-button boxes." The user presses the button to report an emergency and communicates the nature of the emergency, and thus the type of assistance needed, through the speaker. To make the one-button alarm boxes accessible to the deaf and hearing-impaired, Defendants have developed a new protocol by which users can communicate the type of emergency they are reporting through a tapping code: a repeated single tap on the mouthpiece of an ERS box will signify a request for police services, and a repeated double-tap indicates a request for fire services. This protocol is also to be used by deaf individuals reporting emergencies from pay telephones using the E–911 system. The parties have submitted conflicting affidavits about the extent of training dispatchers have received to recognize the tapping protocols and whether the protocols have been publicized in the deaf community.

BARS or two-button ERS boxes are located on approximately every second block throughout most areas of the City. In addition, approximately 2,000 boxes are located on highways, terminals, and bridges and inside buildings of public assembly.

The plan enjoined by this Court in February 1996 provided for the elimination of all street alarm boxes. The plan contemplated that the only notification alternative to the street alarm boxes would be the predecessor to the E–911 system, to which access would be gained through home telephones or public telephones. At that time, the E–911 system was not fully operational. *Civic Ass'n,* 915 F.Supp. at 629. There was no evidence that the City had developed or disseminated a protocol to permit the deaf and hearing-impaired community to use the E–911 system. *Id.* at 630.

However, the City recently converted from its former 911 telephone emergency system to the E–911 system, which provides automatic location and telephone number identification ("ALI/ANI"), permitting a more efficient response to calls received, including silent calls. E–911 has also been designed to deter false alarms, since such calls can be traced.

On April 23, 1996, the Fire Department submitted to the City Council a proposal for the continuation of a street alarm box system in modified form. The plan, entitled "False Alarm Reduction Program" and dated April 23, 1996 (the "April Plan"), was ratified by the City Council's passage of Local Law 35 (the "Law") on May 2, 1996 and Mayor's approval on May 14, 1996. Under the new law, the Fire Department would remove all of the old electro-mechanical lever-activated BARS boxes from the system, and would redistribute the newer ERS intercom-style boxes throughout the City so that these boxes would be approximately 1,000 feet apart, as opposed to approximately 500 feet apart, on average, under the existing system. However, although the average distance between boxes would have been 1,000 feet apart, there would have been large areas where no boxes were located. Many of these areas have a greater concentration of public telephones.[1] Altogether, the system would have had approximately 10,700 alarm boxes. The Law authorized the replacement of all of the older electro-mechanical BARS boxes and two-button ERS boxes with one-button ERS boxes.

All calls from the one-button boxes were to be received in a joint NYPD/NYFD emergency operations center. Defendants anticipated that the use of single-button boxes would deter false alarms because individuals making a malicious call would risk the possibility of a police, rather than a Fire Depart-

---

1. The Fire Department also proposed to provide alarm boxes at current levels (*i.e.,* at levels in effect immediately prior to the 1995 deactivation) in community boards with less than 90 percent residential telephone penetration (currently, eighteen of the 59 community boards), as well as on roadways with a past pattern of vehicle acci- dents reported by alarm box; in locations with a past pattern of brush fires reported by alarm box; along highways, bridges, and tunnels; in City schools, public buildings, prisons, shelters, hospitals and other government buildings; in certain remote areas, and in areas adjoining parks or other recreational areas.

ment, response to a silent call, and thus risk arrest. Furthermore, the centralized handling of fire and police alarms permits unified monitoring of fire alarms, thus facilitating police monitoring of false alarms and apprehension of individuals making false alarms. No evidence has been submitted to establish whether or not communications could be centrally received and monitored as easily coming from two-button boxes as from one-button boxes.

In the pilot areas exempted from the February 9 injunction, the Defendants have deactivated all of the older BARS and two-button ERS boxes and replaced them with approximately half as many one-button ERS boxes, distributed in accordance with Local Law 35.

Maintenance and repair of the street alarm box system imposes a financial burden on the City. Maintenance of the older BARS boxes, which require more frequent repairs and inspection, is particularly expensive. Moreover, there is some evidence that the BARS boxes are increasingly difficult to repair because parts are no longer available from suppliers. Eventually, BARS boxes will have to be replaced by ERS boxes, at a cost estimated at $20 million.

The diversion of resources from genuine reports of fires and medical emergencies to false alarms reported from ERS boxes causes a further drain on the Fire Department's resources. The Fire Department is currently implementing a program to decrease response time to victims of cardiac arrest and, therefore, increase their survival rates. A reduction in the false alarm burden would facilitate this program. There is also evidence that the Department's new CPR/Certified First Responder–Defibrillation Program will be facilitated if resources are freed from the burden of responding to false alarms.

In addition to false alarms, many of the calls reported from street alarm boxes are redundant. In 1993, ninety-three percent of all calls initially received from street alarm boxes were false alarms, duplicated alarms received from other sources, or constituted ERS silent calls received between 8:00 A.M. and 11:00 P.M.

Despite its drawbacks, the current alarm box system frequently provides the first notification of major fires and other emergencies and is not in imminent danger of becoming outmoded. In 1993 and 1994, 15,380 and 13,013 calls received from alarm boxes, respectively, provided the only alarm for a fire or other emergency.

Moreover, the false alarm problem may be partially alleviated without dismantling or radically modifying the existing alarm box system. From 1993 to 1994, the incidence of false alarms from the street alarm box system declined by approximately fourteen percent. That decrease was achieved by hiring a part-time dispatcher to assist in screening ERS calls during the peak false alarm period.

The City conducted a test in the pilot areas of the tapping protocol and the one-button boxes in September 1996. In that test, emergency assistance was not provided in response to 27 of 33 tapping calls made, a failure rate of 82%

Defendants have withdrawn their motion to permit them to proceed with the April Plan, and thus will retain the existing street alarm box system in most areas of the City. Defendants also represented at oral argument that it would not be unduly costly or burdensome to convert the one-button boxes back to two-button boxes. However, the City does not plan to restore the boxes removed from the pilot areas or to convert the one-button boxes installed there to two-button boxes. Replacing all of the removed boxes, many of which were BARS boxes, with two-button boxes would cost approximately $5.4 million.

Defendants have indicated that they are currently soliciting bids for a "state-of-the-art" street emergency reporting system that would permit hearing-impaired callers to communicate the type of emergency services needed and provide a mechanism by which dispatchers can notify the hearing-impaired caller that the call was received and appropriate services have been dispatched. There is no evidence that any bids have been received to date.

*Discussion*

### I. Legal Standard for Vacating or Modifying Injunction

■ "An injunction is an ambulatory remedy that marches along according to the nature of a proceeding. It is executory and subject to adaptation as events may shape the need, except where rights are fully accrued or facts are so nearly permanent as to be substantially impervious to change." *Sierra Club v. United States Army Corps of Engineers*, 732 F.2d 253, 256 (2d Cir.1984) (citing *United States v. Swift & Co.*, 286 U.S. 106, 114, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932)). A court may modify a permanent or final injunction, such as the injunction in the present case, when there has been a "significant change in the law or facts," *Sierra Club*, 732 F.2d at 256, so as to make modification equitable.

Plaintiffs contend that the experience in the pilot areas warrants extension of the current injunction to order Defendants to restore the street alarm box system in the pilot areas, so that the number and distribution of boxes is the same as it was before the City's plan, and to require that one-button boxes be replaced with two-button boxes or BARS boxes. The question is whether modifying the injunction in this manner is consistent with the purpose behind the original relief: ensuring that the City's emergency response system comports with the Plaintiffs' right to equal access under the ADA and the Rehabilitation Act. *See id.* at 257 (test of court's discretion to modify injunction is "whether the requested modification effectuates or thwarts the purpose behind the injunction").

### II. Standards Under the ADA & Implementing Regulations

■ Title II of the ADA prohibits discrimination against the disabled in public services. In particular, section 202 of the ADA, 42 U.S.C. § 12132, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity." Thus, to establish a violation of Title II, a plaintiff must prove that (1) she is a "qualified individual with a disability"; (2) she is being excluded from participation in or being denied the benefits of some service, program, or activity by reason of her disability; and (3) the entity which provides the service, program or activity is a public entity. See *Clarkson v. Coughlin*, 898 F.Supp. 1019, 1037 (S.D.N.Y.1995).

There is no dispute that Younger and the class are "qualified individuals" pursuant to 42 U.S.C. § 12131(2). The parties agree that the City is a public entity. At issue, then, is whether the one-button alarm boxes and the reduced number of boxes in the pilot areas exclude Plaintiffs from participation in a service, program, or activity by reason of their deafness.

■ Pursuant to 42 U.S.C. § 12134(a), the Attorney General is empowered to promulgate regulations implementing Title II of the ADA. These regulations, codified at 28 C.F.R. ch. 1, pt. 35, are to be given controlling weight, "unless they are arbitrary, capricious, or clearly contrary to the statute." *Does 1–5 v. Chandler*, 83 F.3d 1150, 1153 (9th Cir.1996); *Civic Ass'n*, 915 F.Supp. at 635 (*quoting United States v. Morton*, 467 U.S. 822, 834, 104 S.Ct. 2769, 2776, 81 L.Ed.2d 680 (1984)).

The regulations provide that: "Each facility or part of a facility altered by ... a public entity in a manner that affects or could affect the usability of the facility or part of the facility shall, to the maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.151(b). The term "facility" is defined to include, *inter alia*, "all or any portion of ... equipment." 28 C.F.R. § 35.104.

The regulations governing the "alteration" of public facilities contrast with the regulations governing existing facilities. Although all public programs and services are to be operated so that existing facilities are "readily accessible to and usable by individuals with disabilities," public entities are not necessarily required to make each of their existing facilities accessible or to make changes that would result in "undue financial and

administrative burdens." 28 CFR 35.150(a). The distinction between the treatment of existing facilities and alterations reflects Congress' recognition that mandating changes to existing facilities could impose extraordinary costs. "New construction and alterations, however, present an immediate opportunity to provide full accessibility." *Kinney v. Yerusalim*, 9 F.3d 1067, 1074 (3rd Cir.1993), *cert. denied*, 511 U.S. 1033, 114 S.Ct. 1545, 128 L.Ed.2d 196 (1994). "Thus, while Congress chose not to mandate full accessibility to existing facilities, it required that subsequent changes to a facility be undertaken in a non-discriminatory manner." *Id.* at 1073. The more stringent requirements for alterations reflect a belief that it is "discriminatory to the disabled to enhance or improve an existing facility without making it fully accessible to those previously excluded." *Id.*

In *Molloy v. Metropolitan Transp. Auth.*, 94 F.3d 808 (2d Cir.1996), the Second Circuit considered a claim that the Metropolitan Transportation Authority's plan to reduce the number of ticket clerks at some stations and to install ticket vending machines violated Section 242 of Title II of the ADA, which provided that:

> It shall be considered discrimination ... with respect to alterations of an existing station or part thereof in the intercity or commuter rail transportation systems that affect or could affect the usability of the station or part thereof, ... to fail to make the alterations in such a manner that, to the maximum extent feasible, the altered portions of the station are readily accessible to and usable by individuals with disabilities....

42 U.S.C. § 12162(e)(2)(B)(i).[2]

The Court of Appeals held that an "alteration" is a "change" to a "facility." *Id.* at 811–12. Although staffing reductions were not deemed "alterations" because they did not constitute changes to the physical structure of the station, *id.*, the Court held that the installation of ticket vending machines, even though the machines were moveable, was an "alteration" within the meaning of the ADA.

*Id.* at 812. Accordingly, the machines were required to be readily accessible to and usable by the disabled. *Id.* The Court also concluded that there was sufficient evidence that the vending machines did not meet this standard, because: (1) they required the user to respond to visual prompts, and (2) although the machines had braille instructions, they lacked an audio mechanism by which visually-impaired users could confirm the accuracy of their ticket purchase. *Id.* at 812–13. The Court stated that "[w]hether the machines are in fact usable by the disabled 'to the maximum extent feasible' will require further factual development below." *Id.* at 813.

### III. *The Current One–Button Boxes Violate the ADA*

■ The conversion of alarm boxes to one-button boxes in the pilot areas constitutes an "alteration" of the public "facilities" for reporting emergencies from the street. As part of the "equipment" provided by the City for reporting emergencies, the boxes fall within the definition of "facility" provided in the regulations. 28 C.F.R. § 35.104. The replacement of a two-button signal system with a one-button system is a "change" to the physical and functional structure of the equipment, and thus constitutes an "alteration" within the meaning of the ADA. *See Molloy*, 94 F.3d at 812.

■ The remaining question is whether the current one-button box portion of the emergency reporting system in the pilot areas, when used in conjunction with the tapping protocol, is accessible to and usable by the hearing impaired to the maximum extent feasible. Based on the evidence presented, the existing one-button boxes do not provide adequate access for the deaf and hearing impaired.

In September 1996, tests of the tapping protocol and one-button boxes conducted by the Defendants, 27 of 33 calls using the protocol received no response. This 82% failure rate demonstrates that the one-button box

---

**2.** Although *Molloy* involved a different section of the ADA than that at issue here, the language of the statute governing alterations of a rail station is virtually identical to the regulatory language governing alterations of public facilities. Thus, *Molloy* provides significant guidance in this case.

system for reporting emergencies is currently inaccessible to and unusable by the hearing-impaired. It is unclear whether the problem lies in the functioning of the equipment itself or inadequate training of dispatchers, but the system of one-button boxes has been shown to be currently unusable by a hearing-impaired person, and thus violates the ADA. It is undisputed that the two-button boxes are more accessible and usable than the one-button boxes. Moreover, Defendants represented at oral argument that reconverting the two-button boxes would not be unduly costly or burdensome. If such a conversion would not be unduly expensive or burdensome, it would be, *a fortiori*, feasible.

However, Defendants contend that ordering conversion of the boxes would be "ill-advised," because the City is in the process of soliciting bids for state-of-the-art boxes that will be fully compliant with the ADA. However, no bids have been received, no design has been proposed and no dates have been suggested for installation of these boxes. Such a speculative plan provides no basis for denying the relief Plaintiffs seek.

It is unnecessary to decide at this time whether a functioning version of the one-button boxes, with an effectively disseminated communication protocol for the deaf and adequately trained dispatchers, would satisfy the strictures of the ADA. It should be noted, however, that the standard applied to alterations would govern, so this Court would have to determine whether the boxes are accessible to and usable by the deaf and hearing-impaired "to the maximum extent feasible." *See Disabled in Action of Pennsylvania v. Sykes*, 833 F.2d 1113, 1120–21 (3d Cir.1987), *cert. denied*, 485 U.S. 989, 108 S.Ct. 1293, 99 L.Ed.2d 503 (1988). Deciding whether a facility is usable to the maximum extent "feasible" requires a fact-specific inquiry based on a fully-developed record. *See, e.g., Norwood v. Dale Maintenance System, Inc.*, No. 82 C 5423, 1983 WL 620, *5 (N.D.Ill. Oct.18, 1983) (feasibility and cost of alternative assignment of job responsibilities to avoid discrimination were questions of fact); *Lareau v. Manson*, 651 F.2d 96, 110 (2d Cir.1981) (no contrary factual proof to counter testimony that using half-way houses to ease prison overcrowding

was not feasible). Although such a record is not presently before the Court, the Second Circuit has indicated that a ticket dispensing machine that provides Braille instructions for the blind, but is unable to audibly confirm the accuracy of a ticket purchase, may not be usable by the blind to the maximum extent feasible. *Molloy*, 94 F.3d at 812–13. Accordingly, an alarm system that relies primarily on voice communication to ascertain and confirm the type of emergency services required should, to the maximum extent feasible, provide a reasonable alternative means by which hearing-impaired individuals can similarly signal and confirm the type of emergency assistance required. Defendants have indicated that they are currently soliciting bids for a notification system that would permit hearing-impaired callers to communicate the type of emergency services needed and provide a mechanism by which dispatchers can notify the hearing-impaired caller that the call was received and appropriate services have been dispatched. At such time as the Defendants have such bids in hand, they may apply for a modification of the injunction, upon a showing that the proposed boxes will be accessible to and usable by the hearing-impaired to the maximum extent feasible.

### IV. *The Reduction in the Number of Boxes Does Not Violate the ADA*

Plaintiffs also seek an injunction to restore all boxes disconnected in the pilot areas, contending that the "thinning out" of the boxes violates the ADA by making it more difficult for the hearing impaired to report fires from the street.

Defendants assert that this thinning does not violate the ADA because the reduction in the total number of street alarm boxes equally burdens deaf and non-deaf individuals who wish to report emergencies through the boxes.

Defendants' position assumes that the "service, program or activity" provided by the City should be defined narrowly as the alarm box system for reporting emergencies. However, the service is more accurately characterized as either: (1) the emergency reporting system as a whole, including both

911 calls from residences and street reporting from telephones and call boxes, as Defendants previously argued, *Civic Ass'n,* 915 F.Supp. at 634; or (2) the street reporting system alone, as Plaintiffs previously argued. *Id.* If the service were defined as the alarm box system alone, the reduction in the number of the boxes would have affected access to the service for the deaf and the non-deaf equally: neither would be able to report emergencies from street alarm boxes. However, if the service was viewed as the entire emergency reporting system or the street reporting system, which included public telephones that were accessible to those who could hear but not to the deaf, the deactivation of the alarm boxes, which were accessible to all, would violate the ADA, unless the City provided means of telephone reporting usable by the deaf.

Defining the scope of the service as the entire emergency reporting system or the street reporting system, as opposed to just the alarm box system, is necessary to effectuate the remedial purposes of the ADA. *Civic Ass'n,* 915 F.Supp. at 634 (as remedial statute, ADA must be broadly construed to effectuate its purpose); *Kinney v. Yerusalim,* 812 F.Supp. 547, 551 (E.D.Pa.) (same), *aff'd,* 9 F.3d 1067 (3d Cir.1993), *cert. denied,* 511 U.S. 1033, 114 S.Ct. 1545, 128 L.Ed.2d 196 (1994); *Kornblau v. Dade County,* 86 F.3d 193, 194 (11th Cir.1996) (same). As this Court previously concluded, it would be inconsistent with Congress' express goal of "eliminat[ing] discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(1), to permit a municipality to remove a component of a service that is accessible to the deaf and the non-deaf, leaving behind a component that is accessible only to the non-deaf.

■ As Plaintiffs contend, then, the reduction in the number of boxes in the pilot areas constitutes a change to the overall system of reporting emergencies (or reporting emergencies from the street). However, the legal analysis of the reduction in the number of boxes is different from the analysis of the change from two-button to one-button boxes. Unlike the conversion of alarm boxes to a one-button format, the reduction in the number of boxes is not an "alteration" of a specific component of existing "equipment." Thus, the question is not whether an altered piece of equipment is accessible to or usable by the hearing-impaired "to the maximum extent feasible," but whether the thinning of the alarm boxes results in an emergency reporting system that is "readily accessible to and usable by" the deaf and hearing-impaired. See 28 C.F.R. § 35.150(a); *Civic Ass'n,* 915 F.Supp. at 639.

There is no dispute that those two-button boxes that will be restored to the pilot area pursuant to this opinion will be usable by the deaf and hearing-impaired. Plaintiffs contend, however, that reducing the number of boxes will render the overall street reporting system in the pilot areas less accessible to deaf people than to hearing people because using a non-intuitive tapping protocol to signal the type of emergency over the pay telephones that "replace" the deactivated boxes is more difficult for the deaf than using normal speech for the same purpose is for the hearing. Thus, Plaintiffs argue, the overall reporting system, consisting of phones and two-button boxes, will be less accessible to the deaf than the non-deaf.

Individuals reporting emergencies from the street must convey two pieces of information to the emergency dispatcher: their location and the type of emergency. The E–911 system has been implemented city-wide. Although Plaintiffs question its accuracy, it appears that a dispatcher can now determine the location of an E–911 call without voice communication. *See Civic Ass'n,* 915 F.Supp. at 629 (location identification "is subject to flaws, but the evidence to date has not established that these imperfections are substantial"; accuracy of system is between 87%—99% statewide, with accuracy greatest in urban areas). The ERS boxes also provide automatic location information. Thus, the system will determine a deaf person's location without verbal communication. The remaining question is whether the deaf have a "readily accessible and usable" means of communicating the nature of the emergency they are reporting.

It may be, as Plaintiffs contend, that the use of the tapping protocol is a less natural,

and thus a more difficult method of relaying important information under stressful conditions than using one's natural language. However, for several reasons, this added difficulty of telephone reporting is not sufficient to support an injunction to restore all alarm boxes to the pilot area at this time.

■ First, Plaintiffs have provided no direct evidence that the remaining alarm boxes will not constitute a means of emergency reporting that renders the overall system "readily accessible" to the deaf and hearing-impaired. Unlike the complete elimination of the boxes, a significant number of two-button alarm boxes will remain on the street, and thus, this "usable" component of the system may itself be "readily accessible," even if it is less accessible than it was previously. Absent evidence that deaf individuals find that walking an additional block or two to locate an alarm box so difficult as to render the alarm box system practically inaccessible, it is inappropriate to impose an order that would essentially forbid the City from making any reduction in the number of alarm boxes. While a complete elimination of the alarm boxes, with no accessible reporting alternatives, would result in a system that is entirely inaccessible to the deaf, a reduction of 10%, 20% or even 50% may still leave the alarm boxes "readily accessible" to the deaf.

Moreover, it has not been established that the proposed protocol for E–911 reporting will be unduly difficult for the hearing-impaired to learn and to use. The existing two-button alarm box system, which is not challenged, already requires a deaf caller to use a tapping protocol to request fire assistance between the hours of 8:00 A.M. and 11:00 P.M. See Civic Ass'n, 915 F.Supp. at 626–27 (between 8 A.M. and 11 P.M., no response to silent calls unless dispatcher hears unintelligible voice or two taps, followed by pause and three more taps). Plaintiffs have provided no direct evidence that any deaf individual in the pilot area has had difficulty reporting an emergency because of the use of the tapping protocol on public telephones. The Defendants should be permitted to continue to use the pilot areas to test the effectiveness of the "thinned out" emergency reporting system with fewer alarm boxes and the E–911 tapping protocol.

Furthermore, irrational results would follow from adoption of Plaintiffs' argument that any change that produces a system that is marginally less accessible to the deaf than the non-deaf violates the ADA. Even outside the pilot areas, public telephones are already more plentiful than alarm boxes, and thus hearing individuals have a broader range of methods to report emergencies from the street than do the deaf. Despite this disparity, it is not reasonable to order all telephones disconnected from the E–911 system so that the emergency reporting system is equally convenient for the deaf and non-deaf. Further, it does not appear to be feasible to order the installation of "buttons" or some other mechanism[3] on pay telephones to simplify reporting for the deaf, since the telephones, which are owned by NYNEX and other telephone providers, are not under the control of the Defendants. Similarly, it would not be reasonable or feasible to prevent the installation of additional public telephones equipped with E–911 features, even though such new telephones would improve the usability of the emergency reporting system for the hearing more than for the deaf.

Finally, restoring all the disconnected boxes in the pilot areas would impose a substantial financial burden on the Defendants. Installing enough two-button ERS boxes to restore the status quo ante in the pilot areas would cost $5.4 million. Although Defendants could more cheaply restore the boxes if they were to reinstall the decommissioned BARS boxes, rather than purchasing new two-button ERS boxes, the City has concluded that it would be burdensome to restore antiquated, difficult to maintain equipment. That policy conclusion is entitled to some deference, particularly where, as here, the Plaintiffs have not demonstrated that the overall reporting system in the pilot areas is not readily accessible to and usable by the deaf.

Accordingly, Defendants will not be ordered to restore the full number of boxes

---

3. One such mechanism would include signage instructing, perhaps in writing or in sign-language pictograms, the deaf user how to employ the tapping protocol.

that were deployed previously in the pilot areas.

Plaintiffs do raise legitimate concerns, however, about: (1) whether the more widely dispersed alarm boxes will be "readily accessible," (2) the effectiveness of the Defendants' dissemination of the tapping protocol to the deaf community, and (3) the training of dispatchers to respond to such protocols. If evidence arises demonstrating that (1) the boxes are not "readily accessible," (2) deaf individuals have not been apprised of the E–911 tapping protocol within three months of this order, or (3) tapping calls made from public telephones do not elicit an appropriate response from dispatchers, then Plaintiffs will be permitted to apply to this Court for further relief.

***Conclusion***

For the reasons set forth above, Defendants are hereby enjoined to convert all one-button emergency alarm boxes to two-button boxes. Plaintiffs' motion to enjoin Defendants to restore all alarm boxes removed from the pilot areas is denied.

It is so ordered.