**Jacqueline SPECINER,
et al., Plaintiffs,**

v.

**NATIONSBANK, N.A., Defendant.**

**No. MJG–99–CV–1782.**

United States District Court,
D. Maryland.

March 15, 2002.

Nicole Schultheis, Schultheis & Walton, PA, Baltimore, MD, for Plaintiffs.

Kathleen Pontone, Lisa F. Orenstein, Miles & Stockbridge, PC, Baltimore, MD, for Defendant.

## MEMORANDUM OF DECISION

GARBIS, District Judge.

This case was tried before the Court without a jury. The Court has heard the evidence, reviewed the exhibits, considered the materials submitted by the parties, and had the benefit of the arguments of counsel. The Court now issues this Memorandum of Decision as its findings of fact and conclusions of law in compliance with Rule 52(a) of the Federal Rules of Civil Procedure.

## I. INTRODUCTION

The instant case presents issues of great significance to the parties and the public. Accordingly, an introduction to the case prior to the statement of legal rationale is appropriate.

There are no villains before the Court. Plaintiffs seek to obtain unassisted access to a public facility for persons who use wheelchairs for mobility. Of course, wheelchair users are simply people who happen to have limited mobility due to a misfortune. Therefore, in a real sense, Plaintiffs are acting on behalf of all since anyone may become a wheelchair user. Defendants seek to preserve a beautiful and historically significant structure while providing wheelchair users the full range of banking services.

As stated in a Native American proverb, one cannot truly judge another one has walked a mile in the other's moccasins. In the instant case, the significance of the barriers to wheelchair access to the public banking hall at issue can best, and perhaps only, be appreciated from the vantage of a wheelchair.

Persons who can walk can enter the building at issue, ascend a beautiful flight of marble steps, and proceed into a 1920's style attractively appointed public facility to conduct their banking at a teller's counter. In sharp contrast, the wheelchair user can get to the banking hall only through an inconvenient nonpublic assisted route that includes intrusion upon workers in their offices. It is understandable, then, that wheelchair users would equate themselves with victims of invidious discrimination. Hence, the Court can understand the reasons for the emotion with which the case was presented. However, the Court finds totally unjustified Plaintiffs' accusa-

tions of a callous disregard for persons with disabilities on the part of Nations-Bank.

The Court finds that NationsBank (like its predecessors) does everything reasonable, and more, to accommodate disabled persons who wish to use its facilities. There is no suggestion that, except because of the problems inherent in the historic building at issue, NationsBank has failed to provide essentially complete access to wheelchair mobile patrons in the District of Maryland (or elsewhere for that matter). In the instant case, NationsBank seeks, as is its right and in service of a public interest worthy of recognition, to preserve historically significant features of the building at Ten Light Street.

The Court, then, is presented with a conflict between the desire of wheelchair mobile persons to have unassisted access to public facilities and the desire of an operator of an historical building to preserve the structure in its original architectural form. As discussed herein, when the United States Congress enacted the Americans with Disabilities Act that governs the resolution of the dispute, it reached a compromise between the absolutes of complete wheelchair accessibility to all public facilities and complete sanctity for older structures. It is in light of that statute, and without resolving the public policy arguments of the respective parties, that the Court decides the instant case.

## II. *BACKGROUND*

### A. *The Parties*

Plaintiff Jacqueline Speciner ("Speciner") is an individual with disabilities that require her to use a wheelchair for mobility. Speciner, therefore, has a "disability" within the meaning of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* (the "ADA").

Plaintiff MCIL Resources for Independent Living, Inc. ("MCIL") is a Maryland non-profit corporation with a mission to provide services and advocacy to help empower persons with disabilities to lead self-directed, independent, and productive lives in the community.

Defendant NationsBank, N.A. ("the Bank [1]" or "NationsBank") is a corporation which, among other things, operates bank branches. The Bank (or a predecessor in interest) was at all times relevant hereto the owner of the building at Ten Light Street in Baltimore City ("the Building"). On the mezzanine level of the Building, there is a magnificently appointed banking hall (the "Banking Hall") with teller counters and other facilities for members of the public to conduct banking business.

### B. *The Building*

Since 1929, the most prominent feature of the Baltimore City skyline has been the thirty-four story Aztec-revival art deco structure located at Ten Light Street ("the Building"). The Building, and those responsible for its creation, have received a number of architectural awards and honors.

The Building can be entered through sets of doors on Baltimore Street and on Light Street. Both entrances are constructed of bronze, marble, and limestone and appear today very much as they did when built in 1929. The doorways are surrounded by stone sculptures that depict, among other things, occupations and events contributing to Baltimore's progress and historical events, including the writing of the "Star–Spangled Banner"

1. As pertinent to the instant case, Nations-Bank was the successor in interest to Maryland National Bank ("MNB"). Accordingly, MNB and NationsBank are collectively referred to as "the Bank". In 1999, Nations-Bank merged with Bank of America, N.A. and has, since then, operated under the name "Bank of America."

and The Great Baltimore Fire of 1904. Bronze friezes and braided columns frame exterior doorways at both entrances and encase the individual door jambs. Decorative bronze grilles and antique marble line the vestibules between sets of doors at both entrances. Inside of the Building's Light Street entrance, the Banking Hall is separated from the main lobby by a marble stairway and heavily decorated wrought iron gates that were designed by Samuel Yellin, a famous ironworker.

### C. *Access to the Building and the Banking Hall*

A person in a standard size wheelchair can obtain unassisted access to the Building through a wheel chair accessible door at the Light Street entrance. The doorway at the Light Street entrance does not provide a complete entry route with thirty-one inches of clearance, which is typically considered adequate for wheelchair access, due to a narrowing to some twenty-nine and one half inches at one point. Nevertheless, a person in a standard size wheelchair can, without an unreasonable degree of skill or effort, successfully maneuver through the door unassisted.[2] Once inside the Light Street entrance, a wheelchair user can have unassisted access to virtually all of the public facilities in the thirty-four story building but not the Banking Hall.

To get to the Banking Hall, a wheelchair user must proceed, with assistance, through a labyrinthine route. The person must ask a guard for help and wait for a bank employee to operate a non-automatic elevator not generally used by the public to get to the mezzanine level. Once on the mezzanine level, the wheelchair user must proceed through halls, bank offices in some of which employees are working, and a balcony-type area with some narrow passageways to reach an ancient (albeit well maintained) manual elevator. There the wheelchair user again must wait for an elevator operator for transport to the Banking Hall level. At that level, the wheelchair user can proceed through an office area to the Banking Hall itself. Once there, the wheelchair user can obtain service at a desk.[3] Thus, an individual using a wheelchair must endure inconvenience, delay, and, to a degree, the embarrassment of intruding into non-public office areas to reach the Banking Hall.

It is not at all surprising that only rarely do wheelchair users, on the order of only one a year, choose to use the Banking Hall. Nevertheless, in fairness to the Bank, there is no better way to get a wheelchair user into the Banking Hall. Moreover, the Bank makes every effort to provide alternative services at the Building for those who may wish them. And, although providing no basis for excusing the Bank from any legal obligation it may have with respect to the Building, the Bank has a completely accessible branch in a modern building located within three city blocks of the Building.

### D. *The Matters at Issue*

Plaintiffs contend that the Bank is in violation of the ADA with respect to:
- the 1992 modification of the Light Street entrance;
- the continuing absence of wheelchair access to the Banking Hall; and
- the 1994 renovation of the Banking Hall.

**2.** The undersigned Judge, in the course of the trial and on the record, visited the Building, observed persons using wheelchairs, and, himself, used a wheelchair to obtain access to the Banking Hall through the Light Street entrance.

**3.** The teller counters are too high for wheelchair use.

The Court will set forth the pertinent statutory framework and its decision as to Plaintiffs' contentions.

## III. *THE STATUTORY FRAMEWORK*

Title III of the ADA broadly prohibits discrimination against any individual "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates [4] a place of public accommodation." 42 U.S.C. § 12182(a). There is no doubt that Speciner qualifies as an individual with a disability and that the Building was, and is, a "place of public accommodation" within the meaning of the ADA. *Id.*

Under the ADA, there are different degrees of obligations imposed on an operator with respect to:

- existing [pre-January 26, 1993 [5]] facilities;

- new [post-January 26, 1993] construction; and

- alterations to facilities.

*See id.; Paralyzed Veterans of Am. v. Ellerbe Becket Architects & Eng'rs, P.C.,* 950 F.Supp. 393, 395 (D.D.C.1996), aff'd *sub nom. Paralyzed Veterans of Am. v. D.C. Arena L.P.,* 117 F.3d 579 (D.C.Cir. 1997); *Small v. Dellis,* No. Civ. AMD 96–3190, 1997 WL 853515 at *3–4 (D.Md. Dec.18, 1997), *aff'd,* 211 F.3d 1265, 2000 WL 472873 (4th Cir.2000) (unpublished table decision). The distinction between existing facilities, on the one hand, and new construction and alterations, on the other, is premised upon Congress' intent to "protect existing businesses from undue hardship." *See Pinnock v. Int'l House of Pancakes Franchisee,* 844 F.Supp. 574, 588 (S.D.Cal.1993).

In enacting the ADA, Congress also recognized the national interest in preserving significant historical structures by imposing requirements that allow operators of such structures to become ADA compliant without threatening the historical significance of such structures. ˙ *See* 42 U.S.C. § 12204(c); H.R.Rep. No. 101–485(III), at 73 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 496; H.R.Rep. No. 101–485(IV), at 71 (1990), reprinted in 1990 U.S.C.C.A.N. 512, 560. Accordingly, the ADA must be interpreted bearing this interest in mind.

### A. *New [First Occupied After January 26, 1993] Facilities*

With respect to "new construction", the ADA requires the operator to "design and construct facilities ... that are readily accessible to and usable by individuals with disabilities," unless meeting these requirements would be "structurally impracticable". 42 U.S.C. § 12183(a)(1). However, the Building was constructed in 1929 and is therefore "an existing facility" rather than "new construction" under the ADA. Accordingly, the Bank did not, and does not, have to meet "new construction" standards under the ADA.

### B. *Existing [First Occupied on or Before January 26, 1993] Facilities*

Under the ADA, the operator of an existing facility must remove "architectural barriers ... where such removal is readily achievable". 42 U.S.C. § 12182(b)(2)(A)(iv). If the operator can demonstrate that the removal of a barrier is not "readily achievable", the operator is required to use "alternative methods" to make its goods, services, facilities, privileges, advantages, or accommodations accessible to individuals with disabilities. *Id.* § 12182(b)(2)(A)(v).

---

**4.** In the interest of brevity, the Court will refer to an owner, lessee, lessor or operator of a public accommodation as an "operator".

**5.** An existing facility is one that was constructed for first occupancy on or before January 26, 1993. 42 U.S.C. § 12183(a)(1).

The ADA defines the term "readily achievable" as "easily accomplishable and able to be carried out without much difficulty or expense." 42 U.S.C. § 12181(9).

The ADA provides that:

In determining whether an action is readily achievable, factors to be considered include:

(A) the nature and cost of the action needed under this chapter;

(B) the overall financial resources of the facility or facilities involved in the action; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such action upon the operation of the facility;

(C) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and

(D) the type of operation or operations of the covered entity, including the composition, structure, and functions of the work force of such entity; the geographic separateness, administrative or fiscal relationship of the facility or facilities in question to the covered entity.

*Id.*

## C. *Alterations to Existing Facilities*

When an existing facility is altered in a "manner that affects, or could affect the usability of the facility or part thereof", the operator is under an obligation to make the alterations "in such a manner that, to the maximum extent feasible, [makes] the altered portions of the facility [ ] readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs." *Id.* § 12183(a)(2). Additional requirements are imposed if the alterations are made to an area of the facility containing a "primary function"—*i.e.*, "a major activity for which the facility is intended ... [such as] the customer services lobby of a bank". 28 C.F.R. § 36.403(b). When alterations are made to a primary function area, the operator must "make the alterations in such a manner that, to the maximum extent feasible, the path of travel to the altered area ... [is] readily accessible to and usable by individuals with disabilities". 42 U.S.C. § 12183(a)(2); *see* 28 C.F.R. § 36.403(a). Alterations to the "path of travel" need only be undertaken where they are "not disproportionate to the overall alterations in terms of cost and scope." 42 U.S.C. § 12183(a)(2); *see* 28 C.F.R. § 36.403(f).

The regulations provide that:

[a]lterations made to provide an accessible path of travel to the altered area will be deemed disproportionate to the overall alteration when the cost exceeds 20% of the cost of the alteration to the primary function area.

28 C.F.R. § 36.403(f)(1).

## D. *Historical Preservation Considerations*

 The Department of Justice[6] ("DOJ") has interpreted the ADA's barrier

---

**6.** The ADA charges the Attorney General with establishing standards to carry out the provisions of Title III that are relevant to the instant case. 42 U.S.C. § 12186(b). In furtherance of this objective, the DOJ adopted regulations which incorporate the Americans with Disabilities Act Accessibility Guidelines (the "ADAAG"). 28 C.F.R. Pt. 36; 56 Fed. Reg. 35,544, 35,546 (July 26, 1991). The ADAAG is codified at 28 C.F.R. Pt. 36, App.A. The DOJ's regulations, including the ADAAG, "are to be given controlling weight, unless they are arbitrary, capricious, or clearly contrary to the statute." *Civic Ass'n of Deaf of New York City v. Giuliani*, 970 F.Supp. 352, 358 (S.D.N.Y.1997). Appendix B to 28 C.F.R. Part 36 contains the "Preamble to Regulation on Nondiscrimination on the Basis of Disabil-

removal and alteration requirements in accordance with the Congressional desire to take into account the national interest in preserving significant historical buildings. The DOJ's Technical Assistance Manual states that, in the context of an historic building, "barrier removal would not be considered 'readily achievable' if it would threaten or destroy the historic significance of [the] building". ADA Title III DOJ Technical Assistance Manual § III–4.4200. The ADA's implementing regulations provide that alterations to certain historic facilities need only comply with the ADAAG's accessibility standards "to the maximum extent feasible". 28 C.F.R. § 36.405(a); *see* 42 U.S.C. § 12204(c) (setting forth requirement that regulations pertaining to alterations of qualified historic properties be promulgated). The ADAAG provides specific procedures for determining feasibility, and the regulations state that "if it is determined . . . that it is not feasible to provide physical access to an historic property . . . in a manner that will not threaten or destroy the historic significance of the building or facility, alternative methods of access shall be provided". 28 C.F.R. § 36.405(b); ADAAG § 4.1.7 (definition and requirements of historic properties and procedure for determining feasibility).

In the instant case, there seems to be no dispute that the Building is an historic building within the meaning of the ADA. The parties devoted considerable attention to the historical significance of the Building and the effect of "modernization"

changes made by the Bank and of accessibility changes sought by Plaintiffs. Plaintiffs have presented evidence that the Building has accommodated some "marring" of its 1929 "perfection" in order to remain functional in the modern world. For example, there are structures on the roof for air conditioning, lighting fixtures, sidewalk ATM machines, etc. Of course, the Bank has sought to minimize the erosion of the original appearance of the Building and argues that Plaintiffs' proposal for a ramp on Baltimore Street[7] would be an unseemly "desecration" of an architectural treasure.

The Court does not accept the absolutist position of the Bank. It is true that a stark, bare bones, functional ramp on Baltimore Street would be destructive to the historical significance of a prominent Building feature. On the other hand, the Court assumes that it is possible to (although Plaintiffs certainly did not) provide a design for a ramp that could tolerably well fit in with the architectural aesthetics of the Baltimore Street entrance. Of course, the cost of such a ramp likely would be significant and could constitute a relevant factor in the "readily achievable" determination.

## IV. DISCUSSION

### A. The Light Street Entrance

■ In 1992, the Bank[8] modified the Light Street doors to provide wheelchair access to the Building lobby but, as noted above, did not provide unassisted access to

---

ity by Public Accommodations and in Commercial Facilities" and includes a section by section analysis of the DOJ's regulations and the ADAAG. The DOJ has also issued a Technical Assistance Manual (along with supplements and updates) in an effort to assist operators in understanding their obligations under the ADA.

7. Plaintiffs, to their credit, recognize that there are historically significant features that should be maintained despite the accessibility cost. For example, Plaintiffs do not seek a wheelchair lift on the marble stairway at the Light Street entrance even though it would provide access to the Banking Hall.

8. To be precise, Maryland National Bank, predecessor in interest to NationsBank.

the Banking Hall. Plaintiffs contend that the Bank has not met the ADA's requirement that existing facilities "remove architectural barriers" where such removal is "readily achievable" because there is no unassisted accessible path from the Light Street entrance to the Banking Hall. 42 U.S.C. § 12182(b)(2)(A)(iv) [9].

The Bank, as operator of the Building which is an "existing facility" under the ADA, must remove architectural barriers to access where "readily achievable". 42 U.S.C. § 12182(b)(2)(A)(iv). The term "readily achievable" means "easily accomplishable and able to be carried out without much difficulty or expense." 42 U.S.C. § 12181(9). Barrier removal is not " 'readily achievable' if it would threaten or destroy the historic significance of" the Building. ADA Title III DOJ Technical Assistance Manual § III–4.4200.

There is no statute of limitations issue as to the 1992 door modification because the Bank has a continuing duty to meet the existing facilities standards. 42 U.S.C. § 12182(b)(2)(A)(iv). Accordingly, regardless of when the Light Street door modification was made, or even if the Light Street doors were in the same condition as when constructed in 1929, Plaintiffs' claims would be timely. The question is whether the Bank has removed the architectural barrier at the Light Street entrance to the extent readily achievable.

Prior to 1992 and, possibly since 1929, the Light Street entrance had a series of steps leading up to the entrance. At the top of the steps, there were two adjacent revolving doors, each of which was flanked by a set of single leaf doors. These doors lead into a vestibule and another set of single leaf doors. The width of the vestibule was thirty-two inches in most places but narrowed to twenty-seven inches at one point due to protrusion of the revolving door and one of the single leaf doors. The second set of single leaf doors leads into the main lobby of the Building. The Banking Hall is, and always has been, located up a stairway of twelve marble steps from the main lobby.

In 1992, the Bank took the following action with respect to the Light Street entrance:

- modified the sidewalk slope to provide a smooth, wheelchair-accessible route to the northern side of the entrance;
- modified the two single leaf doors on the northern side of the entrance to provide automatic opening;
- installed a system whereby a customer in a wheelchair could press a button outside the doorway to operate the automatic doors; and
- modified or maintained [10] the revolving doors so that a bank employee could, quite quickly and simply, fold the doors and provide an extremely wide opening for wheelchair access.

As discussed herein, the Bank also provided, and continues to provide, options for alternative service for disabled customers.

The Court finds that the Bank provides disabled customers with reasonable alternative service accommodations. The accommodations include, but are not limited to, curbside (in car) service, service in the lobby, the use of sidewalk ATM machines, and an unfortunately inconvenient route to the Banking Hall (described above). Also, although not in the Building, there is a large, modern, completely accessible, full service branch within three city blocks of

---

9. As discussed in the August 22, 2000 Memorandum and Order Re: Summary Judgment [Docket No. 42] at 28–30, the Court rejected Plaintiffs' contention that the 1992 door modification was an "alteration" under the ADA. See 42 U.S.C. § 12183(a)(2).

10. This may have pre-existed the 1992 modifications.

the Building. Of course, none of the Bank's alternative service options is a substitute for unassisted access to the Banking Hall. Providing these alternative service options does not exempt the Bank from meeting the legal obligations for barrier removal imposed on the operator of an existing facility. Nevertheless, the Court finds that the Bank is in compliance with the ADA in regard to the Light Street entrance.

The Bank has removed all barriers to accessibility to the extent "readily achievable" and, indeed, may well have done even more than required by the ADA. The Bank has provided wheelchair access through the Light Street entrance to the fullest extent possible without engaging in an unreasonably expensive and aesthetically destructive retrofitting project. Most wheelchair users can obtain unassisted access to the Building lobby. Virtually all, if not all, mobile persons with disabilities who could not obtain unassisted access through the automatic door can obtain rea-

sonably convenient assisted access by asking Bank personnel[11] to fold the revolving doors to provide a very wide entrance.

Regretfully, there is no feasible way to provide an unassisted accessible path from the Light Street lobby to the Banking Hall. To accomplish such a result would require enormous expenditures and aesthetic destruction. The tortuous assisted path to the Banking Hall is, unfortunately, of little real utility but is the only path possible due to the 1929 Building design. In sum, the Court finds that there is not, in view of the current state of technology,[12] any "readily achievable" or, indeed, even reasonably feasible way to improve access to the Banking Hall through the Light Street entrance. Accordingly, Plaintiffs do not prevail on their ADA claim with regard to the Light Street entrance.

**B.** *The Baltimore Street Entrance*

■ The Baltimore Street entrance to the Building is shown in the following sketch:

BALTIMORE STREET ENTRANCE

**11.** A guard is on duty and readily available during all banking hours.

**12.** If one becomes available, a movable device that could safely take a wheelchair up a flight

of stairs might well provide a "readily achievable" method of barrier removal that would not destroy the beautiful, historically significant marble stairway.

There are two steps (providing a thirteen inch rise) from the sidewalk to the area in front of the Baltimore Street doors. The first set of doors (shown open) are open only during business hours. The second set of doors consists of four single leaf doors, each with a width of thirty-one and one-half inches. The third set of doors leads directly into the Banking Hall and consists of one revolving door and one single leaf door with a width of thirty-one and one-half inches on each side.

As noted above, to be ADA compliant the Bank must remove architectural barriers to access to the Building where "readily achievable". 42 U.S.C. § 12182(b)(2)(A)(iv). The term "readily achievable" means "easily accomplishable and able to be carried out without much difficulty or expense" and without threatening or destroying the historic significance of the Building. 42 U.S.C. § 12181(9); ADA Title III DOJ Technical Assistance Manual § III–4.4200.

Plaintiffs contend that wheelchair access through the Baltimore Street entrance is "readily achievable." They base their claim on the proposition that the Bank could build a ramp on Baltimore Street to allow a wheelchair-using person to ascend the thirteen inch rise from the sidewalk to the entrance door, which could be made automatic.

■ The parties dispute the allocation of the burden of proof on the issue of "readily achievable." The Court finds the view of the Tenth Circuit persuasive. In *Colorado Cross Disability Coalition v. Hermanson Family Ltd. P'ship I,* 264 F.3d 999, 1005–1006 (10th Cir.2001), the court adopted the approach:

> wherein Plaintiff bears the initial burden of production to present evidence that a suggested method of barrier removal is readily achievable, *i.e.,* can be accomplished easily and without much difficulty or expense. If Plaintiff satisfies this

burden, Defendant then has the opportunity to rebut that showing. Defendant bears the ultimate burden of persuasion regarding its affirmative defense that a suggested method of barrier removal is not readily achievable.

In the instant case, Plaintiffs failed to meet the initial burden of production. They did not produce evidence that the suggested method of barrier removal, *i.e.* a ramp, was readily achievable. Indeed, Plaintiffs here did no more (and, indeed, less) than the Plaintiff in *Colorado Cross Disability.* There, the Court held that:

> Plaintiff introduced evidence regarding only speculative concepts of ramp installation, rather than evidence that a specific design was readily achievable. For instance, Plaintiff failed to present any evidence to establish the likelihood that the City of Denver would approve a proposed modification to the historical building. Plaintiff also failed to provide any precise cost estimates regarding the proposed modification. Perhaps most importantly, Plaintiff's expert testimony failed to demonstrate that under the particular circumstances installing a ramp would be readily achievable. Instead, expert Winter provided speculative conceptual ideas, rather than a specific design which would be easily accomplishable and able to be carried out without much difficulty or expense. Winter acknowledged that his sketch was conceptual and that he did not intend the sketch to be a construction drawing.

264 F.3d 999, 1009.

The Tenth Circuit could almost have been referring to Plaintiffs' evidence in the instant case: the ramp "design" was merely conceptual; there were no meaningful cost estimates; there was no effort to see if the obvious problems of interference with utilities (and other matters) under the

footprint of the ramp could be overcome; and there was little, if anything, to demonstrate that the City of Baltimore would move a bus stop and trees and approve a constriction of the sidewalk less than a block from the City's historical central intersection at Baltimore and Charles Streets.

Even if the Court were to view Plaintiffs' evidence as adequate to shift the burden to the Bank, the Bank has presented evidence adequate to carry its burden of persuasion. The Bank has proven that, in the present context: it is unlikely to be able to obtain City permission to construct a ramp on Baltimore Street in view of traffic and safety considerations; that the civic infrastructure under the footprint of the proposed ramp might prevent altogether or impose great costs of construction; and that it is problematic whether an aesthetically tolerable ramp design could be constructed at a reasonable cost. Hence, if the Bank has the burden of proof, it has proven that providing wheelchair access through the Baltimore Street entrance is not readily achievable.

In sum, Plaintiffs do not prevail on their claim with respect to the Baltimore Street entrance.

## C. *The 1994 Renovations*

There was work done to the Banking Hall area of the Building in 1994. To the extent that the parties were able to present evidence as to the details of the work [13], the project included:

- configuration of modular office furniture and equipment;
- installation of new computers for the tellers;
- installation of a new teller counter;

- adjustment of a teller counter to increase the height of the top by three inches;
- new wall covering and paint for the office area; and
- removal and replacement of two full-partition walls in the manager's office.

The total cost of the project was approximately $294,000.

The ADA's implementing regulations define an alteration as "a change to a place of public accommodation ... that affects or could affect the usability of the building or facility or any part thereof." 28 C.F.R. § 36.402(b).

> Alterations include, but are not limited to, remodeling, renovation, rehabilitation, reconstruction, historic restoration, changes or rearrangement in structural parts or elements, and changes or rearrangement in the plan configuration of walls and full-height partitions. Normal maintenance, reroofing, painting or wallpapering, asbestos removal, or changes to mechanical and electrical systems are not alterations unless they affect the usability of the building or facility.

*Id.* § 36.402(b)(1).

Plaintiffs contend that all, or substantially all, of the work done on the project constituted "alterations" to an area of the Building that "contained a primary function". Therefore, they contend that the Bank was required to "make the alterations in such a manner that, to the maximum extent feasible, the path of travel to the altered area ... [is] readily accessible to and usable by individuals with disabilities". 42 U.S.C. § 12183(a)(2); *see* 28 C.F.R. § 36.403(a). However, as detailed above, alterations to the "path of travel" need only be undertaken where they are

---

13. The passage of some seven years since the project, which was not, in the context of the Building, a substantial one, resulted in the loss of detailed documentation and understandably unreliable memories as to details.

"not disproportionate to the overall alterations in terms of cost and scope." 42 U.S.C. § 12183(a)(2). As provided by 28 C.F.R. § 36.403(f)(1), "[a]lterations made to provide an accessible path of travel to the altered area will be deemed disproportionate to the overall alteration when the cost exceeds 20% of the cost of the alteration to the primary function area."

In the instant case, the evidence does not warrant a definitive finding of the precise portion of the 1994 project that should be classified as "alterations" for ADA purposes. While the Court could make a reasonable estimate, any such finding would be moot. In the instant case, even if the entirety of the 1994 project constituted "alterations" under the ADA, Plaintiffs would not be entitled to relief because, as discussed below:

- the claim based on alterations is time barred; and
- there is no feasible proportionate remedy.

1. *The Alterations Based Claim is Time Barred*

The question of whether an "alterations" claim under 42 U.S.C. § 12183(a)(2) and 28 C.F.R. § 36.403 can be time barred is one of first impression. Nevertheless, the Court does not find the question to be a difficult one. The statute, the regulations thereunder, and common sense all indicate quite strongly that a three year period of limitations is applicable.

The statute at issue, the ADA, does not specify a limitations period. In the absence of a statutory limitations provision, the Court should apply the most appropriate state law limitations period. *See* 42 U.S.C. § 1988(a). To determine which limitations period is most appropriate, the Court is to select the state statute most analogous to the Federal claim and consider whether applying that limitations period is consistent with the Federal statute and

its underlying policies. *See Kohler v. Shenasky*, 914 F.Supp. 1206, 1209 (D.Md.1995) (citing *McCullough v. Branch Banking & Trust Co.*, 35 F.3d 127, 129 (4th Cir.1994)). As this Court held in *Kohler*, the three year limitations period applicable to state law civil actions is the most appropriate in the context of an ADA civil rights claim. 914 F.Supp. 1206, 1211. Hence, an ADA action must be brought within three years of the alleged violation.

A three year limitations period is also contemplated by the pertinent regulations. As stated therein:

[i]f an area containing a primary function has been altered without providing an accessible path of travel to that area, and subsequent alterations of that area, or a different area on the same path of travel, are undertaken within three years of the original alteration, the total cost of alterations to the primary function areas on that path of travel during the preceding three year period shall be considered in determining whether the cost of making that path of travel accessible is disproportionate.

28 C.F.R. § 36.403(h)(2)(i).

Thus, the regulations support a three year reach back and no more. As noted herein, because Plaintiffs' claims regarding the Light Street and Baltimore Street entrances are based upon alleged continuing violations, they are not barred by limitations. *See Deck v. City of Toledo*, 56 F.Supp.2d 886, 892–93 (N.D.Ohio 1999) (continuing violations of civil rights set the time limitations running anew). The "alterations" claim, however, is based upon action taken in 1994, which allegedly established a path of travel obligation in connection with the "alterations". The three year limitations period for a claim based

on the 1994 renovations expired well before the 1999 filing of the instant lawsuit. Accordingly, Plaintiffs' "alterations" based claim is time barred.

### 2. There is No Feasible Proportionate Remedy

■ The total cost of the 1994 renovations was some $294,000. As discussed above, operators are required to make alterations to a primary function area so that "the path of travel to the altered area . . . [is] readily accessible to and usable by individuals with disabilities." 42 U.S.C. § 12183(a)(2). However, alterations rendering the path of travel accessible need only be made where the cost of doing so does not exceed 20% of the cost of the alterations to the primary function area. See id.; 28 C.F.R. § 36.403(f)(1). Accordingly, in the instant case, assuming the entire $294,000 cost of the 1994 renovations was for "alterations" to a primary function area, the path of travel alterations would have needed to be undertaken only if the cost would not have exceeded $58,800 (i.e. 20% of $294,000).

There has been no showing that the Banking Hall could be made accessible, or even materially less inaccessible, with an expenditure of anything less than hundreds of thousands of dollars or more. Accordingly, if the Bank were required to spend $58,800 (or even some increased amount to take into account inflation from 1992), it could not make the path of travel to the Banking Hall readily accessible, or even marginally more accessible, than it is now. Thus, there would be no cost-proportionate remedy even if the 1994 alterations claim were timely and if the entirety of the 1994 renovations constituted "alterations" to a primary function area under the ADA.

### V. CONCLUSION

For the foregoing reasons, Judgment shall be entered for the Bank by separate Order.